# EXHIBIT F

STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
Facsimile: (775) 786-7764
E-Mail: steve@harrislawreno.com
Attorneys for W. Donald Gieseke, Trustee

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

\* \* \* \* \*

IN RE:

DOUBLE JUMP, INC.

☐ AFFECTS THIS DEBTOR

☒ AFFECTS DORA DOG
   PROPERTIES, LLC

☒ AFFECTS DOG BLUE PROPERTIES,
   LLC

☒ AFFECTS BRANDY BOY
   PROPERTIES, LLC

☒ AFFECTS 475 CHANNEL ROAD, LLC

☒ AFFECTS PARK ROAD, LLC

☒ AFFECTS 140 MASON CIRCLE, LLC

☐ AFFECTS DC SOLAR SOLUTIONS,
   INC.

☐ AFFECTS DC SOLAR DISTRIBUTION,
   INC.

☐ AFFECTS DC SOLAR FREEDOM, INC.

☐ AFFECTS ALL DEBTORS.

_____/

Lead Case No.: BK-19-50102-btb
(Chapter 7)

Jointly Administered with:

| 19-50103-btb | Dora Dog Properties, LLC |
| 19-50104-btb | Dog Blue Properties, LLC |
| 19-50105-btb | Brandy Boy Properties, LLC |
| 19-50106-btb | 475 Channel Road, LLC |
| 19-50108-btb | Park Road, LLC |
| 19-50109-btb | 140 Mason Circle, LLC |
| 19-50130-btb | DC Solar Solutions, Inc. |
| 19-50131-btb | DC Solar Distribution, Inc. |
| 19-50135-btb | DC Solar Freedom, Inc. |

**TRUSTEE'S MOTION TO ENFORCE
AUTOMATIC STAY WITH RESPECT TO
CIVIL FORFEITURE COMPLAINTS**

Hearing Date:  May 30, 2019
Hearing Time:  10:00 a.m.
Est. Time:  1 hour
Set By:  Calendar Clerk

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

1

1    W. Donald Gieseke, Trustee for the Chapter 7 bankrupt estates of six (6) of the ten (10)

2  Jointly Administered Debtors, specifically, DORA DOG PROPERTIES, LLC; DOG BLUE

3  PROPERTIES, LLC; BRANDY BOY PROPERTIES, LLC; 475 CHANNEL ROAD, LLC;

4  PARK ROAD, LLC; and 140 MASON CIRCLE, LLC, by and through his counsel STEPHEN R.

5  HARRIS, ESQ. of HARRIS LAW PRACTICE LLC, requests entry of an order enforcing the 11

6  U.S.C. §362(a) automatic stay against the United States of America with respect to certain civil

7  forfeiture actions, and alleges as follows:

8                        **I.      <u>BACKGROUND</u>**

9    1.      Established in 2009, DC Solar Solutions, Inc. ("Solutions"), together with DC

10  Solar Distribution, Inc., DC Solar Freedom, Inc., and Double Jump Inc., (collectively the "<u>DC

11  Solar Businesses</u>" or "Company") designed and constructed mobile power systems, which are

12  comprised of solar panels mounted on trailers, and can be combined with light towers, telecom

13  equipment, electric vehicle charging stations, and a number of additional "smart" technologies

14  (collectively, "<u>MSG Systems</u>"). MSG Systems can be deployed to both temporary and long-term

15  locations for a variety of uses without incurring the high cost of permanent or semi-permanent

16  infrastructure.  The MSG Systems have been deployed in approximately 20 states to serve flexibly

17  off-grid needs in a diverse range of industries.  The Company has provided clean mobile energy

18  to private enterprises and government agencies, has powered sporting events for NASCAR and

19  entertainment events like Coachella, as well as to help restore power to cell towers accessed by

20  firefighters during the recent historic 2018 California wildfires.

21

22    2.      The Trustee is informed that Solutions historically designed and manufactured the

23  mobile solar power generators that form the base of the MSG Systems.  Solutions generated

24  revenue by selling the completed MSG Systems to Investment Funds or investors in two types of

25  transactions; financed sale transactions or cash sale transactions.

26    3.      On December 18, 2018, the United States of America ("United States") seized

27  funds from and froze all bank accounts associated with the DC Solar Businesses and the Real

28  Estate Debtors (as defined below).  On the same day, agents from the Federal Bureau of

1  Investigation and the Internal Revenue Service executed sweeping search and/or seizure warrants

2  of the DC Solar Businesses' headquarters in Benicia, CA.  The agents seized hundreds of items

3  essential for the DC Solar Businesses to conduct business, including all of the DC Solar

4  Businesses' computer servers and computers, and hard copy files containing corporate accounting

5  records, corporate formation documents, investment agreements, lease agreements, vendor

6  agreements, communications with investors and customers, and invoices for insurance and utility

7  providers.

8        4.    Each of the DC Solar Debtors commenced cases under chapter 11 of the

9  Bankruptcy Code between January 30, 2019, and February 5, 2019.  Debtor DORA DOG

10 PROPERTIES, LLC; Debtor DOG BLUE PROPERTIES, LLC; Debtor BRANDY BOY

11 PROPERTIES, LLC; Debtor 475 CHANNEL ROAD, LLC; Debtor PARK ROAD, LLC; and

12 Debtor 140 MASON CIRCLE, LLC, each filed Chapter 11 Petitions on January 30, 2019

13 ("Petition Date").  On February 12, 2019, this Court entered its Order jointly administering the

14 ten (10) related Chapter 11 cases, designating Double Jump, Inc. as the lead case. On March 22,

15 2019, this Court entered its Order converting the cases to Chapter 7 proceedings, and on March

16 22, 2019, W. Donald Gieseke was duly appointed as the Chapter 7 interim trustee ("Trustee") for

17 six (6) of the ten (10) jointly administered cases (Case Nos. 19-50103; 19-50104; 19-50105; 19-

18 50106; 19-50108; and 19-50109); collectively the "Real Estate Debtors") (the "Real Estate

19 Debtors" collectively with the "DC Solar Debtors" are the "Debtors").

20        5.    Due to the pre-petition seizure of assets by the United States, and the subsequent

21 Chapter 11 filing and conversion to Chapter 7, neither the DC Solar Debtors nor the Real Estate

22 Debtors are continuing to operate their businesses.

23        6.    The Trustee is informed and believes that the Real Estate Debtors own

24 approximately thirty-eight (38) scheduled real properties, and perhaps nineteen (19) unscheduled

25 properties located in various states and countries, including Mexico, which detailed list of

26 properties owned by each Real Estate Debtor is attached hereto as **Exhibit "A"** ("Property" or

27 "Properties").

7.      On February 8, 2019, just a week after the Petition Date, the United States filed a Verified Complaint for Forfeiture In Rem in the United States District Court, Eastern District of California, as Case No. 2:19-cv-00247-JAM-DB ("First Forfeiture Action") and then immediately filed an Amended Verified Complaint for Forfeiture In Rem in the same case (See Docket No. 106). The First Forfeiture Action seeks civil forfeiture under Title 28, Section 1355(a) of certain real properties and six (6) LLCs that were allegedly acquired from the "proceeds of crime" or facilitated the acquisition of property from "proceeds of crime."

8.      On April 15, 2019, the United States also filed a Verified Complaint for Forfeiture In Rem in the United States District Court, Eastern District of California, as Case No. 2:19-cv-00636-JAM-DB ("Second Forfeiture Action") (See Docket No. 593) and then on April 18, 2019, filed an Amended Verified Complaint for Forfeiture in Rem in the same case. The Second Forfeiture Action seeks civil forfeiture under Title 28, Section 1355(a) of certain real properties and six (6) LLCs that were allegedly acquired from the "proceeds of crime" or facilitated the acquisition of property from "proceeds of crime."   (The "First Forfeiture Action" and "Second Forfeiture Action" are collectively referred to as the "Forfeiture Actions"). To the best of the Trustee's information and knowledge, no criminal indictments have been made against any of the Debtor entities or their principals.

9.      The United States did not seek relief from stay from this Court or determination that the automatic stay did not apply to the Forfeiture Actions before those were initiated.  Some of the subject Properties listed on the attached **Exhibit "A"** are subject to the pending Forfeiture Actions, and thus have serious implications on the assets of these bankrupt estates because the Trustee estimates the collective value of those Properties subject to forfeiture at more than $40 Million.  The United States has taken the position that its Forfeiture Actions are excepted from the automatic stay pursuant to its alleged "police and regulatory power" pursuant to 11 U.S.C. §362(b)(4), but the Trustee does not believe that these Forfeiture Actions are excepted from the bankruptcy stay for the reasons set forth in this Motion.  Moreover, since one of the Trustee's primary duties under 11 U.S.C. §704(a) is to "collect and reduce to money the property of the

1   estate for which such trustee serves….", the Trustee believes it is imperative to seek a

2   determination from this Court that the United Stated is subject to the automatic stay with respect

3   to the estate's property affected by the Forfeiture Actions.

4          10.    On April 24, 2019, Trustee's counsel transmitted a letter via email to Andre M.

5   Espinosa, Assistant United States Attorney, advising him of the Trustee's position that the

6   Forfeiture Actions are not excepted from the automatic stay.  A copy of the April 24, 2019 letter

7   is attached hereto as **Exhibit "B"**.  To date, the Trustee has not received a response from Mr.

8   Espinosa, thus the Trustee believes that the United States disagrees with the Trustee's position.

9                        **LEGAL ARGUMENT**

10        A determination as to whether the automatic stay applies is a bankruptcy core matter

11   pursuant to 28 U.S.C. §157(b)(2)(G).

12        28 U.S.C. §1334(e) grants the district court in which a case under title 11 is commenced

13   or is pending, exclusive jurisdiction of all property of the estate, wherever located, of the debtor

14   as of the commencement of such case, and of property of the estate.  28 U.S.C. §157(a)

15   automatically refers any and all proceedings arising under title 11 to the bankruptcy judges for

16   the district.  Thus, this Court has jurisdiction to adjudicate this Motion.

17        Although the United States has initiated its Forfeiture Actions, any property subject to

18   those proceedings does not vest in the government until the United States successfully obtains

19   forfeiture judgments.  Once there is a forfeiture judgement in favor of the United States, then the

20   Properties would relate back and vest in the government as of the date of the alleged unlawful

21   activities.  United States v. A Parcel of Land, Bldgs., Appurtenances & Improvements, Known as

22   92 Buena Vista Ave., Rumson, NJ, 507 U.S. 111, 122 L. Ed. 2d 469, 113 S. Ct. 1126 (1993).  As

23   of the date of this Motion, the Properties subject to the Forfeiture Actions are still property of the

24   bankrupt estates and the Trustee is seeking to protect the estates' interests in such Property.

25        Additionally, it is important for this Court to make a formal, informed determination as to

26   whether the automatic stay applies to the Forfeiture Actions, because any actions taken by a

27   creditor in violation of the stay are void *ab initio*. Schwartz v. United States (In re Schwartz), 954

28   F.2d 569, 571 (9th Cir. 1992).  If the United States proceeds with its Forfeiture Actions without

1  resolving this issue, and it is later determined that the §362(b)(4) exception did not apply to its

2  proceedings, then the Forfeiture Actions would be void and the interim disruption to the

3  administration of these estates would be for naught.

4        11 U.S.C. §362(a) creates an automatic stay against the Debtors and all property of the

5  estates as of the commencement of the cases.  The Trustee does not dispute that 11 U.S.C.

6  §362(b)(4) provides an exception to the automatic stay provisions of 11 U.S.C. §362(a) with

7  respect to commencement or continuation of governmental enforcement actions pursuant to

8  police and regulatory powers.  However, the instant Forfeiture Actions do not fall within the

9  exception of 11 U.S.C. §362(b)(4).

10       Governmental units and agencies are excepted, under 11 U.S.C. §362(b)(4) from the

11  automatic stay when acting to enforce their police or regulatory power.  The Ninth Circuit has

12  generally construed the phrase "police or regulatory power" to refer to the "enforcement of laws

13  affecting health, welfare, morals and safety, **but not regulatory laws that directly conflict with**

14  **the control of the *res* or property by the bankruptcy court**."  City & County of San Francisco

15  v. PG&E Corp., 433 F.3d 1115 (9th Circ. 2006), *citing* Hillis Motors, Inc. v. Haw. Auto Dealers'

16  Ass'n, 997 F.2d 581, 591 (9th Cir. 1993) (emphasis added); Missouri v. U.S. Bankruptcy Court

17  for Eastern District, 647 F.2d 768 (8th Cir. 1981), cert denied, 454 U.S. 1162, 102 S.Ct. 1035, 71

18  L.Ed.2d 318 (1982).  Such exception is "intended to be given a narrow construction in order to

19  permit governmental units to pursue actions to protect the public health and safety and not to

20  apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor,

21  or property of the estate." Id, *citing* Fed. Trade Comm'n v. First Alliance Mortgage Co. (In re

22  First Alliance Mortgage Co.), 264 B.R. 634, 646 (Bankr. C.D. Cal. 2001) (quoting 124 Cong.

23  Rec. H11,089 reprinted in 1978 U.S.C.C.A.N. 6436, 6444-45).

24       The mere fact that a government action relates primarily to public health, safety or welfare

25  does not perfunctorily except the action from the automatic stay under Section 362(b)(4). In

26  establishing whether a particular governmental action is exempted, the specific action the

27  government is attempting to carry out must be examined. City & County of San Francisco v.

28  PG&E Corp., 433 F.3d at 1124-1125, *citing* NLRB v. Continental Hagen Corp., 932 F.2d 828,

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

1    834-35 (9th Cir. 1991), In re Charter First Mortgage, Inc., 42 B.R. 380, 382 (Bankr. D. Or. 1984)

2    ("It is clear to this court that in applying the pecuniary purpose test, it must look to what specific

3    acts the government wishes to carry out and determine if such execution would result in an

4    economic advantage to the government or its citizens over third parties in relation to the debtor's

5    estate.).   It must therefore be determined that the proceeding was commenced in the interest of

6    public health, safety or welfare and that harm would result to public if government action is

7    otherwise stayed.  In re Dervos, 37 B.R. 731 (Bankr. N.D. Ill. 1984).

8         The majority of courts, including the Ninth Circuit, have developed two  alternative tests

9    to be used to determine whether the actions of a governmental unit are in furtherance or an

10   exercise of its police and regulatory power for purposes of the exemptions of 11 U.S.C.

11   §362(b)(4).   The two tests are commonly referred to as pecuniary purpose test and the public

12   policy test.  Universal Life Church v. United States, 128 F.3d 1294 (9th Cir. 1997); Lockyer v.

13   Mirant Corp., 398 F.3d 1098 (9th Cir. 2005); In re First Alliance Mortgage Company, 263 B.R.

14   99 (9th Cir. BAP 2001).  While a governmental unit may only be required to satisfy one of the

15   two tests, courts generally analyze both tests.  City & County of San Francisco v. PG&E Corp.,

16   433 F.2d 1115 (9th Cir. 2006).

17        Under the pecuniary purpose test, the court is required to determine whether the

18   government action relates primarily to the protection of the government's pecuniary interests in

19   the debtor's property or to matters of public safety and welfare.  In re Universal Life Church, 128

20   F.3d 1294 (1997, at 1297).  If the government action is pursued solely to advance a pecuniary

21   interest of the governmental unit then the stay will be imposed. Id. Public policy test distinguishes

22   between government actions that effectuate public policy and those that adjudicate private rights.

23   Id.  If the governmental action concerns only the parties who are immediately affected, then the

24   debtor is entitled to the same protection it would receive under the automatic stay if the proceeding

25   were instead in a judicial forum.  In re First Alliance Mortgage Company, 263 B.R. 99 (9th Cir.

26   BAP 2001).  In short, a suit does not satisfy the public purpose test if it is brought primarily to

27   advantage or discreet identifiable individuals or entities rather than some broader segment of the

28   public.  Lockyer v. Mirant Corp., 398 F.3d at 1109, citing Chao v. Hosp. Staffing Servs, Inc., 270

1  F.3d 374 (6th Cir. 2001).

2         In the instant case, the United States fails to satisfy both the pecuniary purpose and the

3  public policy tests for an exemption of its pending Forfeiture Actions under Section 362(b)(4).

4         **A.  The Forfeiture Actions Fail the Pecuniary Purpose Test**

5         If the government's action relates primarily to protection of the government's pecuniary

6  interest in the debtor's property, then the automatic stay is to remain imposed.  Such actions have

7  been described as those that would result in an economic advantage to the government or its

8  citizens over third parties in relation to the debtors' estates.  In re First Alliance Mortgage Co.,

9  263 B.R. 99 (2001 at 107), *citing* In re Charter First Mortgage, Inc., 42 B.R. 380 (Bankr. D. Or

10  1984), City & County of San Francisco v. PG&E Corp., 433 F.2d at 1124-1125.  In the instant

11  case, the United States' action is pursued to advance its pecuniary interest in the Property of the

12  estate subject to the  Forfeiture Actions.

13         The Trustee is aware that the United States most likely intends to rely on a Ninth Circuit

14  B.A.P. case, United States v. Klein (In re Chapman), 264 B.R. 565 (9th Cir. BAP 2001), to support

15  its position that an *in rem* civil forfeiture action falls under the §362(b)(4) exception to the stay.

16  However, the Trustee respectfully submits that: 1) Chapman was decided incorrectly in light of

17  certain Ninth Circuit legal precedent in Lockyer v. Mirant Corp., 398 F.3d 1098; and 2)

18  Chapman's facts are distinguishable from this Chapter 7 case and these Forfeiture Actions.

19  Additionally, Bankruptcy Appellate Panel decisions are not binding on this Court, but Ninth

20  Circuit decisions are.

21         In Chapman, the 9th Circuit BAP found that a civil forfeiture proceeding pertaining

22  to illicit drug activities was excepted from the stay pursuant to §362(b)(4).  The Chapman court

23  analyzed the purpose of statutes and regulations pertaining to forfeitures in connection with drug

24  offenses as set forth in 21 U.S.C. §881 et seq.  The Forfeiture Actions in this case arise under 18

25  U.S.C. §981(a)(1)(C) which are not the same as drug forfeiture statutes.    Additionally, the

26  Chapman court failed to analyze if the government's forfeiture action was "primarily intended to

27  advantage or discreet identifiable individuals or entities rather than some broader segment of the

28  public."  Lockyer v. Mirant Corp., 398 F.3d at 1109, *citing* Chao v. Hosp. Staffing Servs, Inc.,

1   270 F.3d 374 (6th Cir. 2001), but the Chapman court did find that the primary purpose behind 21

2   U.S.C. §881(a)(7) was to punish and deter offenders rather than to compensate and reward the

3   government for pursuing the property.    As indicated previously, 21 U.S.C. §881(a)(7) is not the

4   subject of the Forfeiture Actions in this Chapter 7 case.

5        In this case, the primary purpose of the Forfeiture Actions is simply to compensate and

6   reward the government for pursuing the property and/or to compensate any "victims" of the

7   Debtors' alleged fraudulent activities.  Put simply, through the Forfeiture Actions, the United

8   States is attempting to collect a debt from the Debtors that it believes is due.  The United States'

9   purpose is entirely pecuniary in nature, and contrary to the narrow exception that Congress

10  intended for exceptions under §362(b)(4).  In fact, a careful analysis of Ninth Circuit cases

11  upholding the §362(b)(4) exception provides governmental agencies the ability to enforce

12  regulations, enjoin certain activities, or liquidate damages, fines, penalties or restitution claims

13  against a debtor so that those agencies can obtain allowed claims in the bankruptcy cases.

14  However, none of those Ninth Circuit cases have allowed an exception to the stay under

15  §362(b)(4) so that a governmental agency can forcefully remove assets from the estate in a civil

16  proceeding or to disrupt the orderly distribution of assets of the bankrupt estate.  In fact, the plain

17  language of §362(b)(4) does not allow for the enforcement of a money judgment, which makes it

18  clear that Congress' intent was not to remove or deplete the estate's assets in allowing for

19  exceptions to the stay under §362(b)(4).

20       Allowing a civil forfeiture action to strip the bankrupt estate of assets in order to reward

21  the government or some other group of potential creditors is contrary to Ninth Circuit holding

22  that "police or regulatory power" does NOT refer to the enforcement of regulatory laws that

23  directly conflict with the control of the res or property by the bankruptcy court.  City & County

24  of San Francisco v. PG&E Corp., 433 F.3d 1115 (9th Circ. 2006), citing Hillis Motors, Inc. v.

25  Haw. Auto Dealers' Ass'n, 997 F.2d 581, 591 (9th Cir. 1993).

26       Lockyer v. Mirant Corp., supra, is instructive in this case.  In determining that a suit for

27  divestiture of certain assets under the Clayton Act came within the §362(b)(4) exception, the court

28  specifically stated the following:

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

9

1    "The Attorney General's section 16 Clayton Act suit clearly satisfies the "pecuniary

2    purpose" test.  After having been trimmed down by the district court, the suit now

3    seeks only divestiture.  The Attorney General **does not seek a monetary**

4    **recovery, and asserts no interest of the state in the three power plants that**

5    **are the subject of his suit.**  Rather, the Attorney General seeks only an injunction

6    that would require Mirant to divest itself of the plants.  **There is nothing in this**

7    **relief that would allow the Attorney General to gain an advantage over**

8    **creditors in the bankruptcy proceeding.**  If granted, the only effect of the

9    remedy would be to require that the plants be sold, with the entire proceeds going

10    to the bankruptcy estate. "

11    Lockyer v. Mirant Corp., 398 F. 3d 1098, 1108-1109 (emphasis added).  This determination and

12    analysis by the Ninth Circuit Court of Appeals is a clear indication that an important factor in its

13    decision that the Attorney General's suit was not primarily pecuniary in nature was the fact that:

14    1) the Attorney General did not seek any interest in the bankruptcy estate's property, 2) the suit

15    was only seeking to require the debtor to sell the property, with the proceeds of such sale to remain

16    in the estate, and 3) the suit would not provide the Attorney General with an advantage over

17    creditors in the bankruptcy proceeding.

18        In this case, the United States' civil Forfeiture Actions are nothing more than a property

19    grab in order to obtain an advantage for itself and some alleged victims over the other creditors

20    of the estate.  Moreover, the Forfeiture Actions severely diminish the property or *res* of the estate

21    and directly conflict with the Trustee's duties to control the Property to accomplish an orderly

22    distribution to all creditors in order of statutory priority under the Bankruptcy Code.

23        **B.  The Forfeiture Actions Fail the Public Policy Test**

24        Pursuant to the public policy test, the Court is to distinguish between government actions

25    that effectuate public policy and those that adjudicate private rights.  If the suit is brought

26    primarily to advantage discreet and identifiable individuals or entities rather than some broader

27    segment of the public, then it fails the public policy test.  Lockyer v. Mirant Corp., supra at 1109,

28    *citing* Chao, 270 F.3d 374 at 378 (suit by U.S. Secretary of Labor to recover unpaid wages related

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

1    to violations of the Fair Labor Standard Act does not come within §362(b)(4)). All acts of

2    Congress by definition declare national policy, and suits to enforce those acts necessarily

3    effectuate the public policy of the United States, but the public policy test calls upon courts to

4    analyze whether **a particular lawsuit** is undertaken by a governmental entity in order to

5    effectuate public policy.   <u>Chao</u>, 270 F.3d 389-390.

6        In this case, the United States alleges that the Debtors' principals orchestrated and

7    perpetrated a Ponzi-arrangement in an elaborate fraud scheme.   If true, then the victims of the

8    purported fraud have private rights against the Debtors which they can exercise, and the United

9    States cannot assert an alleged exception under §362(b)(4) to grab the Debtors' property for the

10   benefit of an identifiable group of victims over other creditors.   As indicated in a letter dated April

11   15, 2019 addressed to the Trustee from the Assistant United States Attorney, the purpose of the

12   Forfeiture Actions is to preserve forfeited assets "for distribution to the victims of the fraud and

13   money laundering offenses…".   *See* April 15, 2019 letter attached hereto as **Exhibit "C"**.   As

14   stated by the <u>Chao</u> court and cited by the Ninth Circuit in <u>Lockyer v. Mirant Corp</u>., when an action

15   incidentally serves public interests but more substantially adjudicates private rights, courts should

16   regard the suit as outside the police power exception, particularly when a successful suit would

17   result in a pecuniary advantage to certain private parties vis-à-vis other creditors of the estate,

18   contrary to the Bankruptcy Code's priorities.   <u>Chao</u>, 270 F.3d at 390.

19       The <u>Chao</u> court further found that the subject 29 U.S.C. §216(c) suit in <u>Chao</u> did seek to

20   punish wrongdoers and thereby provide a general deterrent to unfair labor practices, but even that

21   award was remitted to affected employees.   The prosecution of such suit, therefore, "serves little

22   public purpose other than a general interest in seeing laws enforced – a public interest no greater

23   than that served by the hypothetical state attorney general suing to enforce a private contract".

24   <u>Chao</u>, 270 F.3d at 391.

25       In this case, the United States has stated to Trustee's counsel in its April 15, 2019 letter

26   that the proceeds from the Forfeiture Actions are intended for the victims of the Debtors' alleged

27   fraud, and therefore serve no more public purpose than the suit in <u>Chao</u> which was not excepted

28   from the automatic stay under §362(b)(4).

1    Moreover, the victims of any fraud perpetrated by the Debtors are better served by

2    allowing the Trustee(s) of these bankrupt estates to marshal the assets in an orderly fashion,

3    establish some uniform claims procedure for alleged victims, and then distribute the proceeds to

4    all allowed creditors in a pro-rata manner in order of priority.

5    A central purpose of our bankruptcy system is to maximize the recovery for creditors

6    through reorganization or an orderly liquidation, and the fair and just distributions to the creditors,

7    according to the priority of their claims under the Bankruptcy Code. Congress subordinated

8    penalties, including forfeiture claims, behind general creditors in a bankruptcy liquidation. 11

9    U.S.C. §726(a)(4). Accordingly allowing the United States to continue prosecuting its Forfeiture

10    Actions for the sole purpose of forcefully taking assets from the bankrupt estates irreparably

11    harms the rights of affected creditors and victims by giving the holder of a subordinate claim a

12    superpriority right to property which would otherwise be divided among the innocent creditors.

13    Moreover, the Trustee is required to protect, preserve and account for assets under much stricter

14    guidelines and oversight than the United States is subject to in civil forfeiture actions.

15    If the United States argues that the primary purpose of the Forfeiture Actions is to punish

16    wrongdoers or deter criminal activity, that alone does not suffice to qualify for an exception under

17    §362(d)(4).  Moreover, the Carpoff family, which are the alleged wrongdoers, are not in control

18    of, and do not receive any benefit from the Property subject to the Forfeiture Actions.  No member

19    of the Carpoff family is an officer, a director, or a manager of any Debtor.  By proceeding with

20    the Forfeiture Actions, the United States would be harming the innocent creditors of these

21    bankrupt estates by depleting the assets that would be available for distribution to them through

22    these bankruptcy cases.  To the extent the United States seeks to assert a claim against the

23    Debtors' estates, then such claim, if valid, would also be paid in order of priority through the

24    bankruptcy cases.

25    In further examining the United States' purported "public policy" motives in civil

26    forfeiture actions, the Court should take judicial notice of a report dated March 2017 from the

27    Office of the Inspector General of the U.S. Department of Justice, entitled "Review of the

28    Department's Oversight of Cash Seizure and Forfeiture Activities" (the "OIG Report"), which is

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

12

attached hereto as **Exhibit "D"**.    The OIG Report found that the Department of Justice (the "Department") and its investigative components does not use aggregate data to evaluate fully and oversee their seizure operations, or to determine whether seizures benefit criminal investigations or to the extent to which they may pose potential risks to civil liberties.    The OIG Report further stated that "without evaluating data more systemically, **it is impossible for the Department to determine (1) whether seizures benefit law enforcement efforts, such as advancing criminal investigations and deterring future criminal activity**, or (2) the extent to which seizures may present potential risks to civil liberties." OIG Report at Pages ii and iii (emphasis added).

In its Conclusion and Recommendations, the OIG Report further stated, in part, that "**we found that the Department neither formally collects nor evaluates the data necessary to determine whether its seizures and forfeitures advance or relate to federal investigations.** Instead, **we found that the Department uses the data it collects primarily to report on the types of assets seized and the financial results of its forfeiture efforts.**" OIG Report at Page 38 (emphasis added).

Lastly, in its summary of Previous Reviews Related to Asset Seizure, the OIG Report discussed the results of a separate OIG investigation related to Florida's Village of Bal Harbour Police Department (BHPD) which conducted investigative money laundering operations in which the task force laundered over $56 million.    Based on intelligence collected from that money laundering operation, other federal law enforcement agencies conducted additional investigative work which, according to the task force, resulted in the arrest of 84 individuals and the seizure of approximately $49 Million.    The OIG found that the BHPD received over $6 Million in revenue, derived in part from equitable sharing payments related to these seizures.    However, according to the task force official, the task force **did not file a single criminal indictment related to its money laundering investigative operations**.    Importantly, the OIG Report then stated the following: "such outcomes can raise questions about **whether seizures are intended to serve legitimate law enforcement interests or to bolster law enforcement budgets.**". OIG Report at Page ii (emphasis added).

The conclusions and concerns in the OIG Report clearly indicate that the United States

1  cannot credibly allege that its civil forfeiture actions are primarily intended to advance the public

2  policy purposes intended by Congress in the narrow exception of §362(b)(4), rather than to simply

3  collect assets.  As the OIG stated, it is impossible to determine if the asset forfeitures benefit any

4  law enforcement efforts, thus it is impossible to determine if the asset forfeitures serve any

5  legitimate public policy.

6       The United States' Forfeiture Actions were not primarily initiated to effectuate public

7  policy, and the strong public policy of an orderly liquidation and distribution under the

8  Bankruptcy Code far outweighs any tangential public policy interests of the United States in the

9  Forfeiture Actions.

10       **C.  Current Legislation is Pending that If Passed, Would Significantly Amend**

11             **Civil Asset Forfeiture Proceedings**

12       As evidenced by the OIG Report discussed previously, there are significant concerns

13  regarding existing policies and procedures relating to asset forfeitures and seizures.  As a result,

14  a proposed bill, H.R. 1895 (the Fifth Amendment Integrity Restoration Act of 2019 or "FAIR

15  Act") was introduced on March 27, 2019 in the U.S. House of Representatives.  The FAIR Act is

16  a bi-partisan bill co-sponsored by 11 Democratic Representatives and 7 Republican

17  Representatives.  If approved and enacted, the FAIR Act would make significant amendments to

18  the General Rules for Civil Forfeiture Proceedings codified in 18 U.S.C. §983, including: 1)

19  changing the government's initial burden of proof that property is subject to civil forfeiture from

20  "preponderance of the evidence" to "clear and convincing"; 2) by requiring a closer nexus

21  between the property and the alleged offense; 3) by requiring more accountability and stricter

22  guidelines for the disposition of forfeited property; and 4) by amending the proportionality

23  requirements.  Importantly, if enacted, the FAIR Act would apply to any civil forfeiture

24  proceedings pending on or filed after the date of enactment of the Act and to any amounts received

25  from the forfeiture of property on or after the date of enactment of the Act.  *See* text of H.R. 1895

26  and All Information for H.R. 1895 from Congress.gov, attached hereto as **Exhibit "E"**.

27       As indicated previously, the estates' Property that is subject to the Forfeiture Actions

28  could potentially exceed several million dollars in value.  Thus, the outcome of the Forfeiture

1    Actions has a significant impact on the bankrupt estates and will ultimately determine the totality

2    of assets available for distribution to creditors.  The proposed amendments in the FAIR Act could

3    have a significant benefit for the estate if the Trustee is required to defend the Forfeiture Actions,

4    because the United States would have to meet a higher burden of proof and provide a closer nexus

5    between the alleged offenses and the property subject to the Forfeiture Actions.   The property

6    subject to the Forfeiture Actions does not vest in the United States until such time as a judgment

7    is entered in favor of the United States.  <u>United States v. A Parcel of Land, Bldgs., Appurtenances</u>

8    <u>& Improvements, Known as 92 Buena Vista Ave., Rumson, NJ</u>, 507 U.S. 111, 122 L. Ed. 2d 469,

9    113 S. Ct. 1126 (1993).

10          Because the Forfeiture Actions are still pending, if enacted, the FAIR Act would apply

11    retroactively to any such pending Forfeiture Actions.  Accordingly, even if the Court is persuaded

12    that the Forfeiture Actions are excepted from the automatic stay under §362(b)(4), the Court

13    should use its equitable powers under 11 U.S.C. §105 to enforce the automatic stay against the

14    United States until such time as Congress votes on the FAIR Act, so that the bankrupt estates are

15    not irreparably harmed by the loss of valuable assets that could otherwise be protected by the

16    amendments anticipated in the FAIR Act.

17          **WHEREFORE**, Trustee respectfully requests that this Court enter its order determining

18    that the Forfeiture Actions are subject to the 11 U.S.C. §362(a) automatic stay and not excepted

19    under 11 U.S.C. §362(b)(4), or alternatively, that the Court will modify the automatic stay

20    pursuant to its equitable powers under 11 U.S.C. §105 with respect to the Forfeiture Actions so

21    that those Forfeiture Actions are stayed until such time as Congress votes on the pending FAIR

22    Act; and for such other and further relief as the Court deems just under the circumstances.

23          Respectfully submitted this 2nd day of May, 2019.

24                              STEPHEN R. HARRIS, ESQ.
25                              HARRIS LAW PRACTICE LLC

26                              */s/ Stephen R. Harris*

27                              _____
                              Attorneys for W. Donald Gieseke,
28                              Trustee

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600